627 A.2d 211

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING**

v.

**Richard F. JENNINGS, Appellant.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 12, 1993.

Decided June 4, 1993.

Reargument Denied July 22, 1993.

John R. O'Rourke, Jr., for appellant.

Marc A. Werlinsky, Asst. Counsel–Appellate Section, for appellee.

Before COLINS and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Richard F. Jennings (Jennings) appeals from an order of the Court of Common Pleas of Montgomery County, dismissing his appeal and sustaining the one-year suspension of his operating privilege imposed by the Department of Transportation, Bureau of Driver Licensing (DOT) for his failure to submit to chemical testing pursuant to Section 1547(b) of the Vehicle Code (Code), 75 Pa.C.S. § 1547(b).

On February 1, 1992, Police Officer Charles Stewart (Officer Stewart), employed by the Borough of Jenkintown police department, observed Jennings' vehicle at an intersection waiting for the light to turn green. Officer Stewart noticed that although there was a van behind Jennings, Jennings backed up his vehicle until the driver of the van behind him honked its horn. Once the light turned green, Officer Stewart watched Jennings' vehicle make a wide turn out of its lane through the intersection and proceed at about 15 miles per hour. Officer Stewart followed both vehicles and pulled them both over.

Officer Stewart spoke to Jennings and noticed that his eyes were bloodshot and his breath smelled of alcohol. In response to Officer Stewart's request to see Jennings' license, Jennings told him it was in the trunk of his car. When Jennings walked to the trunk of his car, Officer Stewart observed that he was staggering. Believing that Jennings was driving under the influence, Officer Stewart administered two field sobriety tests to Jennings that he failed. Officer Stewart then placed Jennings under arrest for suspicion of driving under the influence of alcohol, but did not warn him of his constitutional rights under *Miranda*.[1] Jennings was then transported to the DUI Center.

At the DUI Center, Officer Stewart advised Jennings of the Implied Consent Law and requested Jennings to submit to a breathalyzer test.[2] Jennings stated that he did not under-

1. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The "Implied Consent Law", which is found at Section 1547(a) and (b) of the Code, provides in relevant part:

(a) Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle....

(b)(1) If any person placed under arrest for a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to

stand why he had been arrested and Officer Stewart repeated what would happen if he refused to take the test. At that point, Jennings asked to speak to his attorney but was denied that request. Deputy Magurn, employed by the Montgomery County Sheriff's Department, also explained the Implied Consent Law to Jennings several times and requested that Jennings submit to the breathalyzer test. Jennings repeatedly stated that he did not understand what he was being told because he thought he had the right to speak with his attorney. After Officer Stewart and Deputy Magurn each requested again that Jennings submit to the breathalyzer test and Jennings stated that he was confused about his rights, Officer Stewart recorded that Jennings had refused to take the breathalyzer test.

As a result of Jennings' failure to submit to the breathalyzer test, DOT sent him an official notice indicating that his driving privilege was suspended for a period of one year as a result of his refusal to submit to a chemical test on February 1, 1992, pursuant to Section 1547(b) of the Code.[3] Jennings filed an appeal with the trial court, arguing that Officer Stewart did not have reasonable grounds to arrest him, and because he did not believe what he was told about not having a right to an attorney, he never actually refused to take the breathalyzer test.

■ The trial court determined that Officer Stewart had reasonable grounds to stop and arrest Jennings based on the manner in which he was driving and the odor of alcohol on his

do so, the testing shall not be conducted, but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.

(b)(2) It shall be the duty of the police officer to inform the person that the person's operating privilege will be suspended upon refusal to submit to chemical testing.

3. Section 1547(b) of the Code provides in relevant part:

(1) If any person placed under arrest for a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted, but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.

breath. The trial court further found that Jennings had been placed under arrest, and even though he had not been read his *Miranda* rights, Officer Stewart and Deputy Magurn had sufficiently explained the Implied Consent Law to him, including the fact that he was not entitled to an attorney and his constitutional rights were totally inapplicable to the breathalyzer test. Therefore, his refusal, based on his disbelief of what he had been told, did not negate that he had been warned and sufficiently advised of the consequences for refusing to submit to the test. Jennings then filed this appeal.[4]

To sustain a license suspension under Section 1547(b) of the Code, DOT must establish that the driver involved (1) was arrested for driving while under the influence of alcohol, (2) was requested to submit to a chemical test, (3) refused to submit to such a test, and (4) was specifically warned that a refusal would result in the revocation of his driver's license. *Wheatley v. Department of Transportation,* 104 Pa.Commonwealth Ct. 171, 521 A.2d 507 (1987). Once DOT has proven that the driver failed to submit to the chemical test, the burden then shifts to the driver to prove by competent evidence that he was physically unable to take the test or was not capable of making a knowing and conscious refusal. *Department of Transportation, Bureau of Driver Licensing v. Norton,* 103 Pa.Commonwealth Ct. 78, 519 A.2d 1085 (1987).

Jennings argues first that Officer Stewart did not have reasonable grounds for believing that he was driving under the influence of alcohol and arresting him on that charge. Jennings argues that he sufficiently explained that his unusual driving behavior was caused by his belief that the van behind him was harassing him on the road, and he smelled of alcohol because a pitcher of beer had partially spilled on him while he was at a bar prior to being stopped. Officer Stewart, howev-

4. Our scope of review in a driver's license suspension case is limited to determining whether the findings of the trial court are supported by competent evidence, whether erroneous conclusions of law have been made or whether there has been a manifest abuse of discretion. *Department of Transportation v. Gross,* 146 Pa. Commonwealth Ct. 1, 605 A.2d 433 (1991).

er, testified that in addition to Jennings' unusual driving behavior, he smelled alcohol on Jennings' breath, had bloodshot eyes, and a staggered walk to his trunk to retrieve his wallet.

■ Pursuant to Section 1547(a) of the Code, an arresting police officer only needs reasonable grounds, not probable cause, to believe the motorist was driving under the influence of alcohol. *Simpson v. Commonwealth,* 105 Pa.Commonwealth Ct. 635, 525 A.2d 444 (1987). The test for reasonable grounds is whether a person in the position of the police officer, viewing the facts and circumstances as they appeared at the time, could have concluded the motorist was operating the vehicle while under the influence of alcohol. *McCallum v. Commonwealth,* 140 Pa.Commonwealth Ct. 317, 592 A.2d 820 (1991). The police officer need not be correct in his belief. *Department of Transportation, Bureau of Traffic Safety v. Dreisbach,* 26 Pa.Commonwealth Ct. 201, 363 A.2d 870 (1976). In this case, the trial court found Officer Stewart's testimony more credible than Jennings. Because the trial court is the ultimate fact-finder in driver license suspension appeals, and questions of credibility and conflicts in the evidence are for the trial court to resolve, *Department of Transportation, Bureau of Traffic Safety v. O'Connell,* 521 Pa. 242, 555 A.2d 873 (1989), its decision is controlling.

■ Jennings next contends that he did not make a knowing and conscious refusal to take the breathalyzer test because even though he was not given *Miranda* warnings, he expressed confusion over his constitutional right to an attorney after being read the Implied Consent Law. Jennings also argues that because he was confused, he was entitled to a further clarification of the law. We agree.

In *O'Connell,* our Supreme Court held that when a motorist has been given *Miranda* warnings, read the Implied Consent Law and asked to submit to a chemical test, and the motorist is confused about his right to an attorney, the police officer administering the test is required to explain that the right to an attorney is inapplicable to the test. This court further

established that *O'Connell* warnings are required, even when *Miranda* warnings are not given when the motorist overtly manifests confusion over his right to counsel. *Department of Transportation, Bureau of Driver Licensing v. Sorg,* 147 Pa.Commonwealth Ct. 82, 606 A.2d 1270 (1992), *petition for allowance of appeal denied,* 531 Pa. 657, 613 A.2d 561 (1992); *Department of Transportation, Bureau of Driver Licensing v. McGarvey,* 136 Pa.Commonwealth Ct. 358, 583 A.2d 39 (1990); *Department of Transportation, Bureau of Driver Licensing v. Fiester,* 136 Pa.Commonwealth Ct. 342, 583 A.2d 31 (1990); *petition for allowance of appeal denied* 528 Pa. 632, 598 A.2d 285 (1991). We have held that a request to speak to an attorney after the Implied Consent Law has been read is an overt manifestation of confusion as to one's right to counsel triggering the *O'Connell* warnings. *Department of Transportation, Bureau of Driver Licensing v. Hoover,* 147 Pa.Commonwealth Ct. 70, 606 A.2d 1264 (1992), *petition for allowance of appeal denied,* 531 Pa. 656, 613 A.2d 561 (1992).

In *Sorg,* we stated that the *O'Connell* warnings must include a statement that the constitutional right to an attorney applies only to criminal proceedings, and that because chemical testing is a civil proceeding and not a criminal proceeding, the right to an attorney does not apply to the testing.[5] We

5. Specifically, we stated in *Sorg* that the motorist should be told the following:
   1. That the right to counsel is a constitutional right and applies only to criminal proceedings, not to civil proceedings.
   2. That the request to submit to chemical testing is not a criminal proceeding, that it is a civil proceeding, but the licensee's refusal to submit to the testing may be introduced in evidence in a subsequent criminal proceeding.
   3. That the licensee does not have a right to contact an attorney or anyone else before taking the test nor does he have the right to remain silent as to the testing procedures; that is, licensee must affirmatively agree to submit to the chemical testing.

   In more recent cases, we have determined that *Sorg* does not mandate that the above information be recited verbatim. A warning may be sufficient where the subject matter is covered, even if the precise terms are not used. *See Department of Transportation, Bureau of Driver Licensing v. Elko,* 155 Pa.Cmwlth. 24, 624 A.2d 717 (1993); *Kaczorowski v. Dept. of Transportation, Bureau of Driver Licensing,* 155 Pa. Cmwlth. 36, 624 A.2d 723 (1993). We note that *Elko* and *Kaczorowski*

believed that this information had to be conveyed in situations as the one before us because:

> .... [T]he concern in *O'Connell* relates to assisting licensees to make knowing and conscious refusals, a goal which can only be achieved by providing them with relevant information as to their rights, a bare warning that *Miranda* rights do not apply to the testing procedures is insufficient. A truly meaningful warning requires, in addition, an explanation as to why those rights do not apply. To require anything less contravenes the purpose of O'Connell and serves only to generate more confusion....

*Sorg,* 606 A.2d at 1272–73. *See also Department of Transportation, Bureau of Driver Licensing v. Ingram,* 149 Pa.Commonwealth Ct. 170, 612 A.2d 634 (1992).

The record in this case reveals that Jennings never received *Miranda* warnings, was read the Implied Consent Law several times, and made a request to speak to his attorney which was denied. Further, Jennings exhibited overt confusion regarding his right to an attorney, as evidence by several statements he made at the hearing, but he received no explanation regarding the inapplicability of that right to the breathalyzer test:

> Q. Why were you confused about the form?

> A. Well, basically, it was telling me I had no rights and it didn't make any sense. From my layman's knowledge of the legal system which is everything I have seen on TV and movies, people have rights.

(Notes of Testimony at 52a.)

> Q. Did Deputy Magurn tell you you didn't have a right to an attorney when you blew into the machine or when you were asked to take this test; that you didn't have a right to an attorney being present at that time?

also stand for the proposition that the inclusion of the statement required in *Sorg*—that the licensee's refusal to submit to testing may be introduced in evidence in a subsequent criminal proceeding—while advisable, is not essential to a knowledgeable decision on whether to submit to a chemical test.

A.  Yes, your Honor, but it didn't make any sense to me.  I didn't believe him.

(Notes of Testimony at 54a.)

Q.  Was it ever adequately explained to you by Seargeant Magurn why he told you you didn't have the right to an attorney?  Did he tell you why you didn't have the right to an attorney?

A.  No.

Q.  Did you ever outright refuse to take the test?

A.  No.

Q.  What was your problem?

A.  My problem is the whole thing seemed totally unbelievable to me ... I just found it totally befuddling that as an American citizen I can be brought in in handcuffs and told I couldn't have a lawyer, I couldn't talk to anyone.

(Notes of Testimony at 55a.)

By so testifying, Jennings evidenced a confusion about his right to counsel.  The effect of such confusion is that *O'Connell* warnings must be given, even if *Miranda* rights have not.  Specifically, in *Sorg* we stated, "Finally, *Fiester* held that the *O'Connell* warning is also required in situations such as that present in *Mihalaki* where no *Miranda* warnings were given, but the licensee (no doubt because of being 'mirandized by TV') exhibits an overt manifestation of confusion over his constitutional rights."  *Sorg*, 147 Pa.Commonwealth Ct. at 88, 606 A.2d at 1273.  As such, Jennings was entitled to further clarification regarding his lack of right to an attorney before taking the breathalyzer test.

Nonetheless, DOT contends that the Supreme Court never intended nor has accepted the extended explanation required in *Sorg* because in its most recent opinion of *Commonwealth v. Danforth*, 530 Pa. 327, 608 A.2d 1044 (1992), it only mentioned that the police should inform the motorist that there is

no right to speak to any attorney without requiring further explanation.[6] However, the issue in *Danforth* was whether the police must explain to a motorist who was given *Miranda* warnings that the right to counsel does not apply to chemical testing, regardless of whether the motorist exhibited confusion about his right to counsel or requested to speak to his attorney. The opinion did not address the extent of the explanation and was not raised by the parties. Because no explanation was given to the motorist, DOT's reliance on *Danforth* is misplaced.[7]

Consequently, because Jennings exhibited overt confusion regarding his constitutional right to an attorney and was not given clarification regarding the differences between the civil and criminal proceedings relative to that right, he did not make a knowing and conscious refusal to take the test. Accordingly, the decision of the trial court is reversed.

**6.** The Supreme Court denied the petition for appeal from our decision in *Sorg* on August 11, 1992, after it issued its decision in *Danforth* on May 22, 1992. However, DOT also argues that because our Supreme Court granted allocator in *Department of Transportation, Bureau of Driver Licensing v. Foster*, 148 Pa. Commonwealth Ct. 44, 609 A.2d 852 (1992) and *Ingram*, we should reevaluate our decision to follow *Sorg*. However, in both *Foster* and *Ingram*, the motorist was given a form which contained both the *Miranda* warnings and the Implied Consent Law, and the motorist became confused. The only difference in *Ingram* was that the form the motorist was given showed that the *Miranda* warnings had been struck. Because those cases are factually different from the present case, we are constrained to follow existing case law. While DOT makes the same argument regarding the fact that allocator has been granted in *Department of Transportation, Bureau of Driver Licensing v. Frain*, 148 Pa.Cmwlth. 636, 611 A.2d 378 (1992), that argument is without merit, because that decision was never published and has no precedential value.

**7.** DOT also attempts to rely on *Department of Transportation, Bureau of Driver Licensing v. McCann*, 529 Pa. 444, 604 A.2d 1027 (1992), *affirmed by an equally divided court*, 135 Pa. Commonwealth Ct. 669, 582 A.2d 438 (1990), where DOT contends the explanation consisted solely of a warning that the motorist had no right to speak to an attorney. Because neither the Supreme Court nor this court published an opinion in *McCann*, DOT's attempt to rely on the facts of the case is wholly improper. Section 414 of the Internal Operating Procedures of the Commonwealth Court of Pennsylvania, implementing Pa.R.A.P. 3702–3751. *See Commonwealth v. Brezan*, 418 Pa.Superior Ct. 243, 614 A.2d 252 (1992).

## *ORDER*

AND NOW, this 4th day of June, 1993, the order of the Court of Common Pleas of Montgomery County, dated October 30, 1992, No. 92–06981, is reversed.

SILVESTRI, Senior Judge, concurring and dissenting.

I concur with the majority in affirming the trial court's finding that Officer Stewart had reasonable grounds to stop and arrest Jennings, but dissent from the reversal of the trial court on the basis that Jennings exhibited overt confusion regarding his constitutional right to an attorney.

After placing Jennings under arrest, Officer Stewart took him to the DUI center. As to what transpired at the DUI center, Stewart testified as follows:

Q  What happened once you arrived at the DUI Center?

A  We got to the DUI Center, and Officer Magurn from the County Deputy Sheriff's Department was present at the time.

At the Center I advised him of his Rights of Refusal. We showed him the form and asked him to sign it, and I believe he refused to sign. I did sign the form stating that I advised him of these Rights of Refusal.

Q  You said you advised Mr. Jennings of his implied consent. What exactly did you advise him?

A  That under the Pennsylvania Motor Vehicle Code if I had probable cause to believe he was driving under the influence of alcohol, I can request him to take a test; and if he refused to take the test, that his license would be suspended for one year just for the refusal.

Q  And what was his response and/or conduct to that question?

A  The whole time he didn't understand why he was stopped. There is no reason for me to stop him. We explained to him several times the implied consent laws and asked him to take the test and everything. Eventually, I just left him in the custody of the Deputy Sheriff. I

asked the Deputy Sheriff if he wanted anything else from me after I read him the Rights and all, and then went back into service after that.

Q   In whose custody did you relinquish him?

A   Deputy Magurn.

(R.R.  28a–29a.)

Although counsel for Jennings cross-examined Officer Stewart as to the circumstances of the arrest, there was no cross-examination relative to what transpired at the DUI center, particularly as to Officer Stewart's request that Jennings undergo chemical breath testing.

Officer Magurn testified as follows:

Q   And did you receive custody of Mr. Jennings from Officer Stewart?

A   Yes.

Q   Would you kindly explain to the Court exactly what happened from the first moment you gained custody of Mr. Jennings exactly what took place?

A   At approximately 2:45 Officer Stewart of the Jenkintown Police Department arrived at the Center with Mr. Jennings (indicating), and I believe we set him down and the first thing we normally do is take a couple of preliminary questions.  Then Officer Stewart read the implied consent to Mr. Jennings.

    Mr. Jennings stated he did not understand what was going on.  He continued not understanding the arrest, what was going on at the Fast Track Center, and we tried to explain the best we could what exactly was going on.

.     .     .     .     .

Q   Let me go back a little bit.  Did you ever tell Mr. Jennings why he was there in response to his question, that he never knew what was going on?

A   That he was under arrest for driving under the influence of alcohol.

Q   Did you explain to him that you were asking him to submit to a breath test to determine his blood alcohol content?

A   Yes, I did.   Once we got him in the other room, I reread the implied consent to Mr. Jennings and I asked him if he understood, and he said he did not understand.

Then I have another form right in front of the Intoximeter 3000, and I proceeded to read that.   It's a little more indepth.

.         .         .         .         .

Q   Officer, I'm showing you what has been marked for identification purposes as Exhibit C–1.   Do you recognize this document (indicating)?

A   Yes, I do.

.         .         .         .         .

Q   And did you read this to Mr. Jennings?

A   I read Number 4, yes, I did.   After Mr. Jennings asked for an attorney, I brought out the form we have from the State of Pennsylvania and I read it to him.

Q   And would you please read Paragraph 4 into the record?

A   It says here, "Mr. Jennings, I am advising you of the following:  You do not have the right to consult with an attorney or anyone else prior to taking the chemical test.  If you fail to provide the requested sample by not following instructions or by continuing to request to speak with someone, it will be considered a refusal."

Q   And what happened after you read this to Mr. Jennings?

A   With that I signed the part right here saying, "I certify I have read the above warnings to the motorist, and gave the motorist an opportunity to submit to chemical testing."   I signed it.

I then have to ask Mr. Jennings if he would sign the middle, which he refused to sign, and then because of that I signed the bottom one where it says, "Motorist refused

to sign after being advised." And I signed my name again (indicating).

Q   And did you request him again after you signed this form for him to submit to another chemical test?

A   Numerous times prior and after we dealt with this form, I asked him to take the test and he continued to refuse to take it.  And I also continued to read, "Implied Consent," to him since he didn't understand it;  and at one time after I read it the third or fourth time, he said that he never saw that, he never heard that before.

(R.R. 33a–37a.)

On cross-examination by counsel for Jennings, Officer Magurn testified as follows:

Q   You do have a specific recollection that Mr. Jennings did ask about his rights?

A   Yes, he did ask about his rights.

Q   Did you ever try to explain to Mr. Jennings the difference between having rights in a criminal case as opposed to not having rights in a civil case such as this?

A   No, I did not.

Q   Did Mr. Jennings tell you that this was a new experience for him and that he had his license since 1962, and he did not have a clue as to what was going on?

A   Yes, I do recall that.

Q   And don't you recall telling Mr. Jennings that he seemed to be a fairly intelligent person, in your opinion?

A   I did state that.

(R.R. 45a–46a.)

Jennings testified as follows:

Q   At some point in time he arrested you and put you in handcuffs, and he took you to the Fast Track Center that evening, correct?

A   Yes.

(R.R. 51a.)

THE COURT: Did deputy Magurn tell you you didn't have a right to an attorney when you blew into the machine or when you were asked to take this test; that you didn't have a right to an attorney being present at that time?

THE WITNESS: Yes, your Honor, but it didn't make any sense to me. I didn't believe him.

.    .    .    .    .

Q Two things. Was it ever adequately explained to you by Sergeant Magurn why he told you you didn't have the right to an attorney? Did he tell you why you didn't have the right to an attorney?

A No.

.    .    .    .    .

Q Did you ever outright refuse to take the test?

A No.

Q What was your problem?

A My problem is the whole thing seemed totally unbelievable to me. . . . I just found it totally befuddling that as an American citizen I can be brought in in handcuffs and told I couldn't have a lawyer, I couldn't talk to anyone.

(R.R. 51a, 54a–55a.)

The problem which Jennings expressed in response to the Court's question was a problem he did not state to either Officer Stewart or Officer Magurn.

In *Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989), the Supreme Court reiterated that questions of credibility and of the weight to be afforded evidence are for the trial court as fact finder to determine, not for the Appellate Courts, so long as sufficient evidence exists in the record to support the trial court's finding. Clearly, the record establishes that Jennings' concern was not his rights, but that he should not have been arrested, a claim he made to the trial court which it rejected.